**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KIMBERLY J. GUEST-MARCOTTE,

     *Plaintiff*,                CASE NO. 1:15-cv-10738

*v.*                           DISTRICT JUDGE THOMAS LUDINGTON
                           MAGISTRATE JUDGE PATRICIA MORRIS

LIFE INSURANCE COMPANY OF
NORTH AMERICA, METALDYNE SALARY
CONTINUATION PLAN, METALDYNE
POWERTRAIN COMPONENTS INC.,
SHORT TERM DISABILITY INCOME
PLAN OF METALDYNE, LLC,

     *Defendants*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
**ON CROSS MOTIONS FOR JUDGMENT AND PLAINTIFF'S MOTION FOR**
**CONSIDERATION OF A RECENT SIXTH CIRCUIT CASE**
**(Docs. 54, 55, 60)**

## I.    RECOMMENDATION

    For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff's Motion for Judgment, (Doc. 54), be **DENIED**, that Plaintiff's Motion for Consideration of a Recent Sixth Circuit Case, (Doc. 60), be **GRANTED**, that Defendants' Motion for Judgment, (Doc. 55), be **GRANTED**, and that Plaintiff's claim be **DISMISSED WITH PREJUDICE**.

## II.    REPORT

### A.    Introduction

1

Plaintiff filed her complaint on February 27, 2015 alleging a claim for short term disability ("STD") benefits under the Employee Retirement Income Security Act of 1974 ("ERISA") against her former employer, Metaldyne Powertrain Co., and her former employer's ERISA Plan administrator, Life Insurance Co. of North America ("LICNA/CIGNA"). (Doc. 1). On April 1, 2015, District Judge Thomas Ludington referred all pretrial matters to the undersigned Magistrate Judge. (Doc. 9). Defendants filed a motion to dismiss, and an answer and counterclaim on April 24, 2015. (Docs. 11, 12). Plaintiff then filed an answer to Defendants' counterclaim on May 13, 2015. (Doc. 17). On June 22, 2015, the undersigned issued a Report and Recommendation granting Defendants' motion to dismiss, to which Plaintiff filed objections on July 2, 2015. (Docs. 20, 21). District Judge Ludington ultimately issued an Order overruling Plaintiff's objections, adopting the Report and Recommendation, and dismissing without prejudice. (Doc. 28).

Following supplemental briefing, Plaintiff filed a motion for leave to file a first amended complaint on November 20, 2015. (Doc. 35).The undersigned then issued a Report and Recommendation, (Doc. 40), which District Judge Ludington adopted, granting Plaintiff's motion to amend in part and confirming the standard of review as arbitrary and capricious. (Doc. 42). Plaintiff then filed an amended complaint on April 19, 2016. (Doc. 44). After submission of numerous administrative and medical records, Plaintiff moved for judgment on August 5, 2016, (Doc. 54), and Defendants likewise moved for dismissal of Plaintiff's case and judgment on the counterclaim. (Doc. 55). Plaintiff later moved for the Court to consider the recent case *Okuno v. Reliance Standard Life Insurance Company*, 836 F.3d 600 (6th Cir. 2016). (Doc. 60).

2

### B.   Administrative Record

#### 1.   Relevant Plan Provisions

Plaintiff's Plan Number was SHD092938. The Plan Holder was Metaldyne, LLC, and it was administered by LICNA/CIGNA. When considering Plaintiff's initial application and each appeal, LICNA/CIGNA cited the following language:

> An Employee is Totally Disabled if, because of Injury or Sickness, he or she is unable to perform all the substantial and material duties of his or her occupation or solely due to Injury or Sickness, is unable to earn more than 80% of his or her Indexed Covered Earnings.

(Doc. 49-1 at 59, 95); (49-5 at 4). This definition of "disability" differs from that presented in Metaldyne's Salary Continuation Plan, which provides:

> You are considered Disabled if, solely because of Injury or Sickness, you are:
> - Unable to perform the material duties of your Regular Occupation; and
> - Unable to earn 80% or more of your Covered Earnings from working in your Regular Occupation

(Doc. 49-1 at 70).

#### 2.   Medical Evidence

Over the course of the review process, LICNA/CIGNA reviewed a plethora of medical evidence from various sources. These sources include: Plaintiff's own account of her condition; Courtney Wilkinson, an acupuncturist; Sheila Isles-Truax, a physical therapist; Jeff Deitrick, a counselor; Dr. Blake Bergeon; Dr. Philip Kadaj; and Dr. Bradley Tinkle. I provide an overview of each source below.

##### i.   Plaintiff's Letter

In pursuit of STD benefits, Plaintiff submitted a letter describing her functional limitations to LICNA/CIGNA. She noted that she had "been living with joint pain since [she] was a young child." (Doc. 49-2 at 42). The birth of her daughter exacerbated this pain "in the fall of 2004," when her "joint pain flared up and [she] again pointed it out to [her] primary care doctor." When she began seeing Dr. Kadaj, he suspected her problems derived from Ehlers-Danlos Syndrome, and referred her to several specialists for further evaluation. (Doc. 49-2 at 43). She urged that "[t]he consistency of being on the computer and reading insurance policies and contracts exacerbated the neck pain," and that her condition declined further over time, as her "hip would dislocate from sitting and or driving long distances." (*Id.*). Eventually, she met with Dr. Tinkle, who suggested she take time off work to "focus on physical therapy and acupuncture and getting [her] downward spiral under control." (*Id.*). Dr. Kadaj agreed. (*Id.*).

Plaintiff wrote that her "health has greatly affected the normalcy [she] once knew" as she has "not been able to be active with [her] eight year old daughter" and was "getting daily migraines." (*Id.*). The hyper-flexibility of her joints required "close supervision [from her] physical therapist when exercising." (*Id.*). The pain also impacted her sleep. (*Id.*). She found taking refuge from this pain impossible, because it was "constant." (Doc. 49-2 at 44). She also contended that several things may not show up on x-rays or MRIs [magnetic resonance images], such as "shirring of the discs when [she] lay[s] down in bed each night." (*Id.*). In one episode, she was "referred . . . to the emergency room. . . . [and] given a sling to wear for a few days because [she] had pulled tendons and ligaments when the arm dislocated." (*Id.*).

4

Explaining why she persevered with conservative treatment, Plaintiff reminded LICNA/CIGNA that she would like to "avoid a spinal fusion and discectomy," even though Dr. Tinkle "recommended that [she] see a neurosurgeon." (Doc. 49-2 at 45). "Once I go the surgical route, there's no turning back and it's inevitable for EDS patients that surgery will take place during their lifetime." (*Id.*). In closing, Plaintiff reiterated that "[s]itting all day at a desk is bad for a healthy person with a herniated disc in their neck. Heck, it's taking me several weeks to be able to complete this letter because of the lack of concentration and days of feeling cruddy. I would not have taken time off if my doctor[s] didn't feel it was warranted." (*Id.*).

### ii.    Courtney Wilkinson

Plaintiff sought acupuncture treatment for pain, and her acupuncturist, Courtney Wilkinson, submitted a note dated August 8, 2012 for LICNA/CIGNA's review. *See generally* (Doc. 49-2 at 47-48). In this letter, Ms. Wilkinson noted that Plaintiff "uses acupuncture as pain management for the chronic, degenerative and progressive disorder of [Ehlers-Danlos Syndrome]." (Doc. 49-2 at 47). After taking a moment to describe this condition, Ms. Wilkinson expressed the opinion that "because of the EDS, [Plaintiff] is experiencing pain and weakness which makes it nearly impossible to complete daily tasks which involve repetitive movements." (*Id.*). She elaborated that Plaintiff "developed tendonitis in her right arm, which [led] her to first seek [acupuncture] treatment" in November 2012. (*Id.*). "The herniated disc in [Plaintiff's] neck was caused by EDS and intensified by daily repetitive work tasks and constant sitting." (*Id.*).

5

According to Ms. Wilkinson, as a result of Plaintiff's acupuncture treatment, Plaintiff was able "to manage the pain" associated with her condition "without turning to narcotics." (Doc. 49-2 at 48). Indeed, pain punished her with such force that reducing her treatments "down to once a week" resulted in "significantly increased" pain levels. (*Id.*). She then reiterated that Plaintiff's condition "is a life-long degenerative disorder that has no cure" and produces "constant pain" which "intensif[ies] the older a person gets." (*Id.*).

### iii.    Sheila Isles-Truax

Physical therapy notes also pepper the medical record submitted for LICNA/CIGNA's review. In treatment notes dated August 16, 2013, Plaintiff's physical therapist, Sheila Isles-Truax noted that Plaintiff "has a chronic condition that requires ongoing, supervised therapeutic exercise training as her instability is very difficult to control without supervision." (Doc. 49-1 at 135). Her treatment plan involved visits twice a week for three months. Ms. Isles-Truax added that Plaintiff "does not have enough cervical/lumbar stability or shoulder strength to tolerate driving or sitting work tasks." (*Id.*).

A later letter to LICNA/CIGNA, dated October 4, 2013, noted that Plaintiff's condition was extremely serious, and illustrated "two incidences where her shoulders have dislocated and needed to be reduced, which ha[d] hindered her progress in physical therapy," as well as "four incidences where she rolled her ankle due to instability." (Doc. 49-1 at 151). Ms. Isles-Truax also opined that Plaintiff's condition would "result in spinal fusions and discectomies" if it continued to decline, and that Plaintiff was thus working "extremely hard to help hold off any long term surgical intervention." (*Id.*).

6

Subjective, objective, assessment, and plan ("SOAP") notes from Plaintiff's physical therapy sessions reflect Plaintiff's complained symptoms and treatment over this period. *See generally* (Doc. 49-1 at 153-62) (11/20/12: "joint muscle pain, 1st treatment to evaluate"; 3/5/13: "woke with stomach pain, craves sweets, arm pain is a little better, upper arm hurting now, congestion. feeling pretty awful, stress"; 4/18/13: "neck is hurting, stress from work pain this morning in whole body, right big toes hurting arms are better"; etc.). Significantly, the notes do not discuss clinical testing done to verify or quantify Plaintiff's symptoms. In addition, an x-ray from September 2013, which took four views of Plaintiff's right shoulder, revealed no acute or chronic body abnormalities, as well as a "preserved" glenchumeral joint. (Doc. 49-2 at 33).

### iv.    Jeff Deitrick

With respect to Plaintiff's counseling, Jeff Deitrick penned an August 14, 2013 note documenting that she had "been attending therapy on a weekly basis" and had "reported numerous emotional and physical symptoms relating to her diminished ability to perform work, despite a strong work ethic." (Doc. 49-1 at 127). He added that her "brief leave of absence from work has provided a noticeable, positive change in her demeanor and life satisfaction." (*Id.*).

A later letter, dated May 30, 2014, he noted that in an intake evaluation in May 2013, he determined that Plaintiff "was suffering from acute and chronic stress due to various circumstances" and "reported having endured 4 months of intense mental anguish over her daughter's distressing behavioral change" which, alongside physical issues, was

7

"making it impossible for her to continue to commute and perform her duties with her employer." (Doc. 49-1 at 166).[1] He continued, observing that the "main reason" driving Plaintiff's difficulties "was that she was experiencing physical limitations arising from her genetic medical condition." (*Id.*). She had described "hip dislocations during her commutes to and from work, discs in her neck being 'out', shoulder dislocations, pain from too much sitting, lack of sleep due to pain, 'nerve' pain in her legs and feet, pain in her back, and pain in her neck." (Doc. 49-1 at 167). Acknowledging that the "connection between stress and the body's health is well documented in professional literature," Mr. Deitrick offered that Plaintiff "would not be the type of person to shirk her duties, or to try to evade responsibility for the purpose of taking advantage of an institution." (*Id.*).

### v.   Dr. Blake Bergeon

The record included several notes from Dr. Bergeon. On June 10, 2013, he observed no musculoskeletal or lumbar structural abnormalities in Plaintiff's lower extremity. (Doc. 49-1 at 116-17). He also noted "[n]ormal myotomal strength throughout the upper extremities" with normal distal strength, deep tendon reflexes, and sensory features. (Doc. 49-1 at 117). Both Spurling's test and Hoffman's test yielded negative results. (*Id.*). His observations include no express functional limitations, although he recommends "working with an appropriate physical therapist" and "home exercises" that could help her "improve in terms of functional status and general fitness." (*Id.*).

---

[1] The record contains precious little information as to Plaintiff's daughter's behavior. For this reason, I cannot elaborate on this given background.

In these notes, Dr. Bergeon suggested that Plaintiff's complaints of radiating symptoms in the upper extremities, coupled with "the underlying abnormality on the MRI," advised in favor of an electrodiagnostic evaluation to see whether she presented "any evidence of superimposed radiculopathy." (Doc. 49-1 at 118). Further testing, however, revealed an "essentially normal" MRI of the lumbar spine, "normal" spinal x-rays, and a "normal" EMG (electromyogram) of the lower extremities. (Doc. 49-1 at 119); (Doc. 49-2 at 90) (documenting a July 2013 electrocardiogram which found no "evidence of radiculopathy, myopathy, generalized or focal peripheral neuropathy, or plexopathy"). Again, he "emphasized the importance of continued persistence with exercise," but provided for no functional limitations. (Doc. 49-1 at 119).

### vi.    Dr. Philip Kadaj

Dr. Kadaj began treating Plaintiff in 2011. (Doc. 49 at 103). On June 6, 2013, he signed a leave request for Plaintiff due to "severe pain and fatigue due to chronic pain syndrome secondary to Ehlers-Danlos Syndrome and subsequent joint laxity." (Doc. 49-1 at 102-03). He anticipated that leave would last for "at least 6 months" but "probably longer." (Doc. 49-1 at 103). In a sparse Medical Request Form dated July 22, 2013, Dr. Kadaj again identified Plaintiff's primary diagnosis as Ehlers-Danlos Syndrome, and indicated that he expected a "[l]imited functional capacity" and "[c]hronic pain." (Doc. 49-1 at 78).  Prescribed limitations included observations that requiring Plaintiff to sit for two hours was "not reasonable," although he failed to detail what objective clinical evidence supported his verdict. (*Id.*). Another note, dated August 19, 2013, said that "[b]eginning

9

June 6, 2013, [Plaintiff] has been unable to perform her necessary work duties, . . . It is in my professional opinion that [Plaintiff] is unable to work due to limited functional capacity and chronic pain." (Doc. 49-1 at 129).

As Plaintiff proceeded with her appeals, Dr. Kadaj submitted several other notes. Notes from September 9, 2013 relay uncorroborated accounts of numbness and tingling, as well as Plaintiff's trouble with her right arm popping out of its socket. (Doc. 49-2 at 18). Later comments from April 30, 2014 document "numbness/tingling," note that a "prior MRI showed periventricular lesions," and recommend "evaluation by neurology for MS [multiple sclerosis]." (Doc. 49-1 at 137). They also indicate that her right shoulder pain likely derived from Ehlers-Danlos Syndrome, and recommend a physical therapy evaluation. (Doc. 49-1 at 138). A separate statement from July 9, 2014 predicts functional limitations nearly identical to (and in a nearly verbatim fashion as) those identified by Dr. Tinkle, discussed below.  (Doc. 49-1 at 169-70).

### vii.    Dr. Bradley Tinkle

On the recommendation of Dr. Kadaj, Plaintiff attended a May 22, 2013 meeting with Dr. Bradley T. Tinkle ("Dr. Tinkle"), a licensed physician with a specialized knowledge of clinical genetics and Ehlers-Danlos Syndrome in particular. (Doc. 49, Ex. A at 15). At this meeting, Dr. Tinkle "did a review of [twenty-two lines of] symptoms that [Plaintiff] was experiencing" and performed a "Genetics Adult Consult," which revealed "[p]olyarticular joint pain" around "many" of Plaintiff's joints, "[t]emporomandibular joint-pain dysfunction system," "[f]atigue," and "Ehlers-Danlos syndrome type III (Doc.

49-1 at 15-16). Thereafter, he "strongly recommended" that Plaintiff apply for STD benefits in order to "start the recommended therapies with the hope that there might be improvement in her multiple disabling conditions." (Doc. 49-1 at 16). Elaborating on the side-effects of her "disabling" conditions, Dr. Tinkle cautioned that Plaintiff was "prevented from driving a vehicle, or operating other machinery for more than 30 minutes . . . ," "prevented from sitting in a stationary position, . . . for more than 20 minutes at a time . . . ," "prevented from engaging in most repetitive motion activities, . . ," and "prevented from all activities that require high mental acuity and/or strong speaking skills." (Doc. 49-1 at 16-17). Dr. Tinkle did not identify what objective clinical testing bolstered these findings, as the echocardiogram and brain MRI he performed came back "normal," and the cervical spine MRI he performed revealed only "moderate central canal stenosis from C4-5 herniated disk; DDD at C3-6." (Doc. 49-1 at 38).

In a Medical Request Form dated June 13, 2013, Dr. Tinkle again notes a diagnosis of Ehlers-Danlos Syndrome, with "multiple joint pains, cervical disc degeneration, poor sleep" and "chronic fatigue" as additional factors implicating Plaintiff's capacity to work. (Doc. 49-1 at 111). LICNA/CIGNA reached out to Dr. Tinkler on June 17, 2013 asking for more information as to "additional clinical exam findings or diagnostic testing to correlate the imposed restrictions and limitations" provided. (Doc. 49-1 at 113). In response, Dr. Tinkler parroted his diagnoses, but cited no objective data in reference to the severity of Plaintiff's symptoms. (*Id.*). An August 12, 2013 letter to LICNA/CIGNA described Plaintiff's symptoms but articulated that he "did not do any functional testing as I am not certified in this area and it has been my experience that these patients can vary

11

tremendously on such evaluations depending on time of day, events preceding day, pain levels, quantity and quality of sleep the night before." (Doc. 49-1 at 109). His recommendations remained "not to lift/push/pull objects of greater than 5 pounds, avoid repetitive motions, and to take frequent breaks. Given [Plaintiff's] current condition, I am recommending short-term disability so that she may focus on an intense rehabilitative program before returning to work and I ask that you grant this." (*Id.*).

### 3.    Administrative Proceedings

As Plaintiff moved through the administrative process in an effort to acquire STD benefits, LICNA/CIGNA denied her claim at the initial stage on August 2, 2013, denied her subsequent appeal on November 21, 2013, and denied another appeal on October 22, 2014. Plaintiff was terminated from her position on November 22, 2013, following the second denial of her claim.

### i.    Initial Claim Denial

LICNA/CIGNA's  August 2, 2013 denial considered: (1) office visit notes dated May 22, 2013; (2) a Medical Request Form authored by Dr. Tinkle from June 13, 2013; (3) a Medical Request Form authored by Dr. Kadaj from July 22, 2013; and (4) a clarification request received from Dr. Tinkle. (Doc. 49-1 at 59). In gathering this information, LICNA/CIGNA followed up with Dr. Tinkle, Dr. Kadaj, and Plaintiff on several occasions. *E.g.*, (Doc. 49-2 at 154, 162); (Doc. 49-5 at 49).

On June 17, 2013, LICNA/CIGNA's Nurse Case Manager, Sarah Drudy, noted that after review that despite "recent abnormal [imaging] findings," other "PE [physical exam] findings" were "unremarkable," and the treatment plan was unclear, for Patient was referred to a physical therapist and acupuncturist." (Doc. 49-6 at 81). Further clarification was needed and sought. (*Id.*). Ultimately, July 3, 2013 commentary from a physician reviewer, Paul D. Seiferth, M.D., notes that Dr. Tinkle's findings, which explicitly indicate Ehlers-Danlos Syndrome with joint pain and laxity, "are remarkable for TMJ [temporomandibular joint] crepitation, normal extremity range of motion, and strength, hyper-mobility of joints on the Beighton scale 5/9." (Doc. 49-6 at 74). He continued to note that imaging showed "central cervical spine stenosis at C4-5 with no clinically correlated signs," and no signs that Plaintiff's condition "worsened at incur" as she was "functional at a sedentary demand level" since her original diagnosis in 2005. (*Id.*). Later, on July 22, 2013, an updated review of medical evidence submitted by Dr. Kadaj failed to support Plaintiff's inability "to perform prolonged sitting, standing, [or] lifting greater than 10 pounds or pushing/pulling activities" with "diagnostic testing results indicating [the] nature and presence of functional loss." (Doc. 49-6 at 67). Her initial claim was denied on these grounds, and indicated that while LICNA/CIGNA was "in no way stating [that Plaintiff's] symptoms do not exist, . . . there [was] no documentation or a functional deficit" and "no diagnostic testing on file to support [Plaintiff's] diagnosis." (Doc. 49-1 at 60).

### ii.      First Appeal Denial

Plaintiff presented more evidence for LICNA/CIGNA's consideration leading up to their November 21, 2013 denial, including: (1) an appeal letter from Plaintiff; (2) an EMG dated September 25, 2013; (3) a letter from Dr. Kadaj dated August 19, 2013; (4) an office visit dated "August 19, 2013 September 9, 2013 [sic]" from Dr. Kadaj; (5) a physical therapy note dated August 15, 2013; (6) a right shoulder x-ray dated September 9, 2013; (7) lab work dated September 25, 2013; (8) a letter from Sheila Isles-Traux; (9) additional physical therapy notes; (10) a letter from Courtney Wilkinson, Plaintiff's Acupuncturist, dated August 8, 2013; (11) a letter from Plaintiff's therapist dated August 14, 2013; (12) a letter from Dr. Tinkle dated August 12, 2013; and (13) notes from an office visit dated May 22, 2013 from Dr. Tinkle. (Doc. 49-1 at 95-96). In preparation for this appeal, LICNA/CIGNA requested follow up information several times. *E.g.*, (Doc. 49-3 at 14); (Doc. 49-5 at 23).

On August 13, 2013, LICNA/CIGNA's Nurse Case Manager, Sara Drudy, discussed some of this evidence as it was submitted. She noted that the evidence shows a diagnosis of Ehlers-Danlos Syndrome "with PMH [past medical history] including multiple subluxation and dislocations," and that certain office visit notes diagram Plaintiff's complaints of "fatigue, anxiety, muscle spasm, pain, and poor body mechanics." (Doc. 49-6 at 55). However, no evidence provided "updated and/or current medical information, diagnostic testing, labwork, etc., indicating the nature of [Plaintiff's] functional loss or documentation indicating updated/current treatment plan." (*Id.*).

On November 20, 2013—after reviewing Plaintiff's file with one of LICNA/CIGNA's medical consultants, Nick Ghaphery, D.O.—the designated Appeal

14

Assignee, Gena Morton, explained the reasons for LICNA/CIGNA's denial. She observed that "the medical information on file did not identify any significant clinical findings to demonstrate a functional impairment." (Doc. 49-6 at 34). She noted that lab results revealed no "significant abnormalities that would preclude functional demands," and that despite office notes from Dr. Kadaj indicating "limited right shoulder motion in abduction, and abnormal joint palpitation, there are no quantified measurable strength or functional deficits documented" to support these alleged limitations. (*Id.*). Plaintiff's EMG, for instance, did not "demonstrate evidence of radiculopathym myopathy, or peripheral neuropathy," and her MRI—which did reveal "moderate central canal stenosis at C4-C5"—nevertheless "would not preclude functional demands." (*Id.*). And although the physical therapy notes seem to evidence "impairment of hand grip strength," other "noted deficits in rotator cuff strength, core strength, and the lower extremities are not quantified" either. (*Id.*). The acupuncturist's note likewise indicated overall pain and weakness in an unquantified manner, therefore failing to support a finding of "strength deficits" necessary for Plaintiff's STD benefits. (*Id.*).  Citing these reasons, the denial again noted that "[w]hile we understand you have reported symptoms, the medical information on file does not support the severity of a disabling condition." (Doc. 49-1 at 96).

Following this denial, Plaintiff was terminated on November 22, 2013. (Doc. 49-1 at 99). The letter announced that Plaintiff proved "unable to return to work at the end of the FMLA leave" allotted from June 6, 2013 to August 28, 2013. (*Id.*). Further:

> At our request, you subsequently provided documentation from your physician Dr. Philip Kadaj, which indicated that you remained unable to perform the essential functions of your position with or without a reasonable

15

accommodation. Further, your physician stated that you are unlikely to recover fully/sufficiently to perform the functions of your position. No anticipated return to work date was known or provided and we have received no further indication that here has been a change in your condition that will allow you to perform the essential functions of your position at any point in the future. Although your physician's documentation clearly indicate that the length of any leave would be indefinite in nature and a return to work was uncertain, we extended your leave of absence to allow for the resolution of the short term disability process that you were separately pursuing with [LICNA/CIGNA]. In light of the conclusion of that process, the unknown nature of your ability to perform your job functions in the future, and the unknown timing of your ability to return to work, your employment with Metaldyne will end November 22, 2013."

(*Id.*).

### iii.    Second Appeal Denial

In denying Plaintiff's second appeal, LICNA/CIGNA reviewed: (1) an appeal letter from Plaintiff; (2) statements from Dr. Tinkle and Dr. Kadaj; (3) Dr. Tinkle's curriculum vitae ("CV"); (4) office notes from Dr. Bergeon; (5) a healthcare provider questionnaire; (6) SOAP notes; (7) letters from Dr. Deitrick, Dr. Kadaj, Dr. Wilkinson, and Dr. Tinkle; (8) a nerve conduction study/EMG; (9) office notes from Dr. Kadaj; (10) physical therapy notes and a letter therefrom; (11) an x-ray of Plaintiff's shoulder and lumbar spine; (12) lab work results; (13) an MRI of Plaintiff's cervical spine; (14) sleep study results; (15) medical request forms; and (16) office notes from Dr. Tinkle. (Doc. 49-5 at 4-5).

In consultation with reviewing physician Shadrach H. Jones, IV, M.D., Appeal Assignee Elizabeth Palmer noted that "the current *objective* or *quantifiable* clinical examination, clinical diagnostic testing, or imaging documentations do not support a significant ongoing physical functional impairment which would preclude [Plaintiff] from

16

performing her own occupational duties on a full time basis." (Doc. 49-6 at 15) (emphasis added). She observed that Dr. Tinkle's medical genetics analysis "did not document any specific physical findings or impairments that would preclude the required occupational functional abilities," that his suggested limitations were "not supported by *documented* impairment," that Dr. Kadaj's physical examination was "normal" and presented no musculoskeletal or neurologic exam findings, that Dr. Bergeon's notes found "no focal weakness or other neurological abnormalit[ies]," and that Dr. Bergeon did not suggest any work limitations, though he "encouraged active independent exercise." (*Id.*) (emphasis added). In light of the dearth of objective clinical evidence to support Plaintiff's functional limitations, her appeal was denied, signifying that "[w]hile we understand [that Plaintiff] has Ehlers-Danlos Syndrome, the clinical findings and test results do not document her physical impairments. There was no clinical evidence that would demonstrate a functional loss and inability to perform her sedentary occupation beginning" June 6, 2013. (Doc. 49-5 at 5).

### C.    Analysis

Generally, a denial of benefits is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). This Court has already determined that the Plan's terms provided the administrator with discretionary authority. (Doc. 42). As such, the Court will review the determination under the arbitrary and capricious standard of review.

17

"The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 259 (6th Cir. 2006). The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Id.* at 165 (quoting *Jones*, 385 F.3d at 661). "Rather, this standard requires us to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Cooper*, 486 F.3d at 165. The administrator must consider the entire record, not selected portions. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002).

## 1. Plaintiff Failed To Present Objective Evidence of Her Functional Limitations

Defendants fervently contend that Plaintiff failed to "provide clinical evidence of a functional loss establishing that she is unable to perform the material duties of her job." (Doc. 55 at 16). In particular, they suggest that Plaintiff's medical sources, especially Dr. Tinkle and Dr. Kadaj, consistently augured drastic functional impairments without any supporting evidence.

The Sixth Circuit has grappled with the tension accompanying a benefits claim for injuries which exhibit inherently subjective symptoms and the demand for objective evidence of illness, albeit in the context of other conditions like fibromyalgia:

> A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective. But objective evidence of *disability* due to fibromyalgia can be furnished by a claimant without the same level of difficulty.

18

*Huffaker v. Metropolitan Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008) (quoting *Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 176 (6th Cir. 2007)) (internal citations omitted). As LICNA/CIGNA indicated in its August 2, 2013 letter, "there is no documentation of a functional deficit" and "no diagnostic testing on file to support [Plaintiff's] diagnosis" of EDS. (Doc. 49-1 at 60). It also noted that "upon physical examination it was noted that [Plaintiff was] well developed and well nourished." (*Id.*). This account provides an accurate review of the record before LICNA/CIGNA. Dr. Tinkle's notes from May 22, 2013 do not disclose any clinical testing to support a finding of disability for Plaintiff's predominantly sedentary work tasks, and he recommended that Plaintiff apply for STD benefits in order to investigate and begin helpful therapies. (Doc. 49-1 at 16-17). His Medical Request Form and Confirmation letter do little to fill this void. (Doc. 49-1 at 111, 113-14). Dr. Kadaj's June 22, 2013 Medical Request Form likewise contains sparse details as to Plaintiff's limitations, and provides no objective clinical support for his findings that (among other things) Plaintiff could not sit for two hours at a time. (Doc. 49-1 at 78).

On appeal, LICNA/CIGNA affirmed this decision reasoning that: (a) a cervical MRI, dated May 11, 2013, revealed nothing which would "preclude functional demands"; (b) a June 20, 2013 EMG failed to evidence "radiculopathy, myopathy, or peripheral neuropathy"; (c) a note submitted by Dr. Kadaj declined to quantify supposed strength or functional deficits; (d) an August 15, 2013 physical therapy analysis likewise did not quantify its discoveries of impaired rotator cuff strength, core strength, or the lower

extremities; and (e) an August 8, 2015 letter from Plaintiff's acupuncturist, Courtney Wilkinson, also failed to quantify Plaintiff's "overall joint pain and[] weakness." (*Id.* at 96). Altogether, there "were no significant clinical findings identified to support a loss of function" and thus nothing to "demonstrate [Plaintiff] would be unable to perform [her] job duties as a Senior Risk Analyst." (*Id.*). As with the initial claim, this account proves accurate. Importantly, notes from those who reviewed Plaintiff's files illustrate a holistic evaluation. (Doc. 49-6 at 34). LICNA/CIGNA's denial of Plaintiff's second appeal follows this familiar pattern. *E.g.* (Doc. 49-6 at 15).

On numerous occasions, LICNA/CIGNA requested clarification of the medical information received from Plaintiff and her medical sources. *E.g.* (Doc. 49-4 at 108) (seeking information from Dr. Kadaj); (Doc. 49-5 at 49) (seeking information from Plaintiff). Of particular note, Dr. Tinkle received such a request and filled out sections relating to Plaintiff's treatment plan, referrals, work accommodations, and ability to return to work—yet withheld mention of clinical testing from the portion devoted to "any additional clinical exam findings or diagnostic testing to correlate the imposed restrictions and limitations [he had] provided" aside from Plaintiff's "subjective complaints of joint pain, chronic fatigue, and tingling and numbness to the lower extremities, . . ." (Doc. 49-1 at 113); (Doc. 49-4 at 11). Having taken these steps, "a plan administrator may rely on a file review and is not required to interview treating physicians." *Bell v. Ameritech Sickness and Acc. Disability Ben. Plan*, 399 F. App'x 991, 997 (6th Cir. 2010). And as articulated in numerous ways in the appellate record before me, the "objective or quantifiable clinical examination, clinical diagnostic testing, [and] imaging documentations d[id] not support a

significant ongoing physical functional impairment." (Doc. 49-6 at 15). Indeed, at each turn, LICNA/CIGNA noted the objective absence of objective medical evidence as the rationale behind its decision. *E.g.* (Doc. 49-6 at 72) ("AP notes recent cardiac workup and MRI of brain normal. PE findings unremarkable. . . . AP notes cx has a history of Elhers [sic] Danlos diagnosed in 2005 and acknowledges recent abnormal findings in imaging study. However, PE findings unremarkable.").

In light of this analysis and the record as a whole, Plaintiff could not meet her burden to demonstrate that her condition prevented her from performing "the material duties" of her job, and that she was "[u]nable to earn 80% or more of [her] Covered Earnings from working" in her position. (Doc. 49-1 at 70).

### 2.   LICNA/CIGNA Did Not Err in Reciting the Wrong Standard

Plaintiff argues that LICNA/CIGNA erred in its analysis of her STD claim because it applied the incorrect "disability" standard, even after "advanced written notice that it was committing a substantive, material error" in doing so, resulting in a "bad faith" decision, and an unfair exercise of its discretion. (Doc. 54 at 10).

Failure to apply the correct standard is error, but not necessarily harmful error. *See Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 659 (6th Cir. 2013). In *Judge*, for instance, the Court found a plan administrator's recitation of the wrong standard harmless where its reasoning throughout the review process remained consistent in noting "the lack of medical evidence supporting the conclusion that Judge could not sit, stand, or walk . . . ." *Id.* Plaintiff seeks to distinguish her case by noting that the administrator in *Judge*, unlike

21

LICNA/CIGNA, rectified this error by reciting the correct standard in subsequent denials after the mistake was brought to its attention. (Doc. 56 at 2). But *Judge* characterized the error as "merely a harmless error that was rectified upon review." *Judge*, 710 F.3d at 659. Its language implies that a *failure* to rectify this harmless error would likewise prove harmless if the administrator's review consistently struck the right chords and recognized plaintiff's inability to fulfill her burden of proof. *Accord Earl v. Life Ins. Co. of North America*, 204 F. App'x 592, 594 (9th Cir. 2006) ("The only evidence Earl produced to support his contention that the other policy applied was the language in the two letters. All other evidence indicated that the alternative definition of disability was quoted by mistake and was taken from a policy that did not apply.").

I will assume for the sake of argument that the policy language LICNA/CIGNA cited is indeed more difficult to meet than the definition stated in the Continuation Plan. But aside from LICNA/CIGNA's erroneous policy recitation, the analysis relayed to Plaintiff discloses no erroneous consideration. Its August 2, 2013 denial explains that Plaintiff's "medical documentation . . . failed to support a functional impairment of such severity that would preclude [her] from working in [her] own occupation as a Senior Risk Analyst." (Doc. 49-1 at 60). It notes that although "we are in no way stating your symptoms do not exist, . . . there is no documentation of a functional deficit." (*Id.*). Language in the November 21, 2013 denial echoes these same considerations, explaining that "in order for Short Term Disability benefits to be considered, we need to establish a condition or combination of conditions that precluded you from performing the demands of your occupation as of June 6, 2013. There were no significant clinical findings identified to

22

support a loss of function. The medical information on file reviewed does not demonstrate you would be unable to perform your job duties as a Senior Risk Analyst." (Doc. 49-1 at 96). Again, on October 22, 2014, LICNA/CIGNA noted that "the exam findings and test results did not demonstrate a physical impairment to support restrictions and limitations. . . . While we understand [that Plaintiff] has Ehlers-Danlos Syndrome, the clinical findings and test results do not document her physical impairments. There was no clinical evidence that would demonstrate a functional loss and inability to perform her sedentary occupation beginning 6/6/13." (Doc. 49-5 at 5). As discussed at length above, the record validates these conclusions at each stage, and there seems little evidence that—"looking at the letter[s] as a whole"—LICNA/CIGNA "misunderstood or misapplied the proper standard." *Judge*, 710 F.3d at 659. *E.g.* (Doc. 49-6 at 67, 74, 81) (internal notes relating to Plaintiff's initial denial); (Doc. 49-6 at 34, 55) (internal notes relating to Plaintiff's first appellate denial); (Doc. 49-6 at 15) (internal notes relating to Plaintiff's second appellate denial).

"[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). As in *Judge*, LICNA/CIGNA's error did not prejudice Plaintiff in the slightest, as their actual analysis recognizes that "[n]o objective medical evidence supports [Plaintiff's] argument" that the suggested functional limitations on her physical abilities actually exist. 710 F.3d at 660. Though LICNA/CIGNA likely cannot provide a reasoned explanation for its persistently incorrect citations of the

STD standard, it can and does provide a reasoned explanation for its decisions. Any error was therefore harmless.

### 3. Plaintiff's Termination Is Not Inconsistent with LICNA/CIGNA's Disability Determination

Plaintiff suggests that Metaldyne's subsequent decision to terminate her employment confirms that, after properly reviewing her medical evidence, "her employer view[ed] her as meeting its Plan's definition of 'disability'" and also "establishes that [Defendants'] denials of disability benefits w[ere] arbitrary and capricious." (Doc. 54 at 19).

The reasons stated for Plaintiff's termination do not conform to Plaintiff's construction. Indeed, the letter expressly declines to find Plaintiff either disabled or not disabled—it explains that "[i]n light of the conclusion of [the benefits] process, the *unknown nature* of your ability to perform your job functions in the future, and the *unknown timing* of your ability to return to work, your employment with Metaldyne will end November 22, 2013." (Doc. 49-1 at 99) (emphasis added). Metaldyne relied on, among other items, notes from Plaintiff's physicians indicating that Plaintiff's return to work would be indefinitely delayed. *E.g.* (Doc. 49-1 at 129). Seen as such, Plaintiff's termination evidences no inconsistency with LICNA/CIGNA's conclusions.

### 4. LICNA/CIGNA Did Not Err in Declining To Request a Physical Exam

Plaintiff finds error in Defendants' decision not to request a physical exam "even though the Plan does provide . . . the ability to conduct such an examination," but rather to

rely on "paper reviews in arriving at its decision with no evidence that the Plan medical doctors ever discussed Plaintiff's disability claim with her treating doctors." (Doc. 54 at 17).

Time and again, this Circuit has held that "it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity." *Rose v. Hartford Financial Services Group, Inc.*, 268 F. App'x 444, 453 (6th Cir. 2008). Though Plaintiff correctly notes that Defendants in this case had the power to request a physical examination and declined to do so, the reservation of this power does not obligate its exercise. There remains "nothing inherently objectionable about a file review . . . in the context of a benefits determination" unless it proves "clearly inadequate." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Such inadequacy commonly arises, for instance, where the file reviewer "second-guesse[s]" the objective evidence on file—*Koning v. United of Omaha Life Ins. Co.*, 627 F. App'x 425, 437 (6th Cir. 2015)—discounts opinions relating to "mental and emotional stability"—*Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 508 (6th Cir. 2008)—or makes "credibility" determinations from afar—*Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 394 (6th Cir. 2009). The appellate record in this case, however, betrays none of these pitfalls.

### 5.   Plaintiff's Claim Under the Disability Plan Should Fail

Defendants note that Plaintiff was employed with Metaldyne Powertrain Components, Inc. (Doc. 55 at 34). The Disability Plan to which Plaintiff refers in her First Amended Complaint only provides benefits to "Full-time Salaried Employees of the

25

Employer," which is Metaldyne LLC, a separate entity. (Doc. 44, Ex. 13 at 3). The Continuation Plan—to which the bulk of Plaintiff's claims are directed—contains no such limitation. (Doc. 50-3 at 7) ("Salary continuation benefits are provided under the Plan for active, full-time, salaried employees scheduled to work an average of at least 40 hours per week."). Plaintiff makes no attempt to rebut Defendants' arguments on this count. Therefore, not only was Plaintiff ineligible for Disability Plan benefits, but she failed to exhaust her administrative remedies with respect to her claim thereunder. Even if she could surpass these hurdles, however, Plaintiff's claim would fail for the reasons specified in the above analysis—the definition of disability is substantially the same, and Plaintiff's evidence thereof similarly inadequate. *Compare* (*Id.*), *with* (Doc. 49-1 at 70).

### 6.   Plaintiff's Motion for the Court To Consider *Okuno v. Reliance Standard Life Insurance Company* Does Not Impact the Result in this Case

On October 3, 2016, Plaintiff filed a motion for the Court to consider *Okuno v. Reliance Standard Life Insurance Company*, 836 F.3d 600 (6th Cir. 2016), noting that it "presents another Sixth Circuit opinion in the line of ERISA benefit cases that criticize plan administrators who, like LICNA/CIGNA in this case, conduct only file reviews to administer disability claims, even though the plan documents permitted a physical examination of the claimant." (Doc. 60); (Doc. 62 at 2). Defendant urges this Court not to consider *Okuno* due to several grounds distinguishing its facts from those at issue here. (Doc. 61).

Since *Okuno* is binding Sixth Circuit precedent, I consider it to the extent it relates to the facts of this case. In this sense, I recommend granting Plaintiff's motion. (Doc. 60).

Unfortunately for Plaintiff, *Okuno* can provide no solace for her argument that LICNA/CIGNA erred in failing to request a physical exam. (Doc. 62 at 2). Surely, a plan administrator's failure to request a physical exam when it had the capacity to do so remains one of many factors considered in evaluating a claim. But the *Okuno* plan administrator, unlike LICNA/CIGNA, "relied exclusively on the use of file reviews by physicians in its employ," which presents "[a]n inherent conflict of interest." 836 F.3d at 609. Moreover, Okuno's claim involved "a mental illness component" not mirrored in these facts, and the plan administrator never sought counsel from Okuno's treating physicians. *Id.* at 610-11. By contrast, LICNA/CIGNA sought extra information from Plaintiff's treating physicians numerous times, considered all record evidence submitted, and retained a consistent rationale throughout the appeals process. *Cf. id.* at 611-12 ("[T]he record contains no indication that Reliance's reviewing health care professionals ever consulted with Okuno's treating physicians, . . . [T]he reports of [Reliance's file reviewers] are silent regarding the opinion of Okuno's treating neurologist. . . . Finally, we note the shifting rationale Reliance offered in support of its denial of Okuno's application over the course of the appeals process further supports our finding that Reliance arrived at its determinations arbitrarily and capriciously.").

Because *Okuno* differs considerably from the facts in the instant case, it does not recast applicable precedent in a manner that changes the analysis set forth above.

### 7.    Defendants' Counterclaim Should Prevail

During the pendency of Plaintiff's administrative appeals for STD benefits, she received payments in the form of a salary continuation, totaling $7,286.29 as of January 21, 2014. (Doc. 55, Ex. 2). Metaldyne requested repayment of these overpayments, and Plaintiff has not repaid them. (*Id.*). "A plan fiduciary is permitted to bring a claim for equitable relief to enforce the terms of the plan." *Hall v. Liberty Life Assur. Co. of Boston*, 595 F.3d 270, 274 (6th Cir. 2010) (citing 29 U.S.C. § 1132(a)(3)). Defendants reserved the right to take "any legal action needed to recover" overpayments of fees. (Doc. 50-3 at 18). As Defendants note in their motion for judgment—(Doc. 55 at 35-36)—the fact that Plaintiff is not entitled to benefits already paid her grants Defendants a right to recover them via "a constructive trust or equitable lien on 'particular funds or property in the [Plaintiff's] possession.'" *Hall*, 595 F.3d at 274-75. As such, Defendants' requested relief is appropriate and should be granted.

### D.   Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that Plaintiff's Motion for Judgment, (Doc. 54), be **DENIED**, that Plaintiff's Motion for Consideration of a Recent Sixth Circuit Case, (Doc. 60), be **GRANTED**, that Defendants' Motion for Judgment, (Doc. 55), be **GRANTED**, and that Plaintiff's claim be **DISMISSED WITH PREJUDICE**.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Date:  December 1, 2016                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 1, 2016                     By s/Kristen Castaneda
                                           Case Manager